## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| TSI USA, LLC | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | CAUSE NO. |
| | § | |
| UBER TECHNOLOGIES, INC. | § | |
| | § | **JURY DEMANDED** |
| **Defendant.** | § | |
| | § | |
| | § | |

## COMPLAINT

Plaintiff TSI USA, LLC ("TSI" or "Plaintiff"), for its Complaint against Uber Technologies, Inc. ("Uber" or "Defendant"), alleges as follows:

### I.   NATURE OF THE ACTION

1.      This is an action by TSI to recover damages from Uber for breach of contract, unjust enrichment, fraud, tortious interference with contract and defamation in connection with TSI's implementation and performance of business travel products and services for Uber.  After inducing TSI to spend capital and deploy personnel to create and implement an international travel services program covering 46 different countries, Uber now refuses to pay TSI the contractually-mandated payment that came due upon its pre-mature termination of TSI.  Uber repeatedly delayed the full contractual launch of TSI's program, constantly added and changed specifications, and ultimately terminated TSI, precluding it from recouping its start-up costs and depriving it of the benefit of its bargain with Uber.

}

2.     Moreover, Uber extended its improper conduct beyond its relationship with TSI.  After terminating TSI, Uber directed its new travel services vendor to hire away at least one of TSI's employees, which it did in breach of that employee's contract with TSI.  In addition, after TSI requested the contractual early termination payment, Uber's management personnel began to make false, defamatory and damaging comments to at least one TSI client, costing TSI business and damaging its reputation.

## II.     PARTIES

3.     Plaintiff TSI USA, LLC is a Delaware corporation with its principal place of business located at 8111 Lyndon B. Johnson Freeway, Suite 900, Dallas, Texas 75243.

4.     Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business located at 1455 Market Street, Suite 400, San Francisco, California 94103.

## III.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this cause of action under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of events giving rise to the claims herein occurred in this district.

7.     The Court has personal jurisdiction over Uber based on, without limitation, its continuous course of doing business in Texas generally and its specific conduct within this state from which the causes of action herein arose.

## IV.     FACTS COMMON TO ALL COUNTS

### A.     Uber Engages TSI To Provide Worldwide Travel Services For Its Management Personnel.

8.     Uber describes itself as "an American international transportation network company."    Upon information and belief, through its software applications, Uber connects riders to automobile drivers in approximately 150 cities in 50 countries and collects 20% of the fees for each ride.    By some published estimates, Uber generates about $2 billion in annual fee revenues (on approximately $10 billion in transaction revenues).    *See* http://www.businessinsider.com/uber-revenue-projection-in-2015-2014-11.

9.     TSI is a business travel management company that contracts with businesses and individuals to manage, schedule, book and optimize their airline, hotel, and related travel needs.    TSI has developed and deploys for its customers proprietary web-based and mobile travel management software applications, as well as booking, auditing, reporting and payment-processing personnel and techniques.

10.     In or about November of 2014, Uber engaged TSI to perform travel services for Uber's management employees, initially in 46 countries throughout the world.    Accordingly, TSI and Uber entered into (i) a Services Agreement dated November 24, 2014 (the "Services Agreement") and (ii) a Statement of Work for Uber Global Travel Management Services of even date (the "Statement

3

of Work" or "SOW") (collectively, the "Agreements").   True copies of the Services Agreement and SOW are attached hereto as Exhibits 1 and 2, respectively, and both are incorporated herein by this reference.

**B.    Uber Demands Service In Short Order, Placing Immediate And Heavy Demands On TSI's Resources And Personnel.**

11.    During the negotiation of the Agreements, Uber insisted upon a global launch commencing on January 2, 2015, for the full range of services Uber required of TSI.  This required 40-days of virtually non-stop work by TSI personnel.  Uber management informed TSI, in substance, that TSI must work like Uber works -- around the clock, sacrificing holidays and personal time to achieve results in accordance with Uber's standards and expectations.

12.     In order to launch the program in the very short time frame that Uber claimed was essential, TSI was required to commence performance pursuant to the implementation criteria set forth in the SOW immediately upon execution of the Agreements.   TSI personnel had to work overtime, forego vacation time and work holidays.  TSI deployed 20 employees in the U.S. and 20 more internationally, and worked virtually around the clock, effective immediately upon execution of the Agreements.

13.    The 17-page Statement of Work (Exhibit 2) reflects the details of Uber's requirements of TSI for the launch of a fully-staffed, technologically-integrated international travel services plan.  As reflected in the fee structure of the SOW, Uber informed TSI that the volume of its travel needs would be over $30 million spent annually on travel services through TSI.

14.     By way of example, TSI trained and deployed of 19 designated and dedicated travel and support consultants in 12 global ticketing hub locations. These consultants provided program implementation, travel assistance, online technical support, service issue resolution, account management, travel consulting, data consolidation, security configuration, marketing communications, and undertook extensive travel to and from Uber offices throughout the world.

15.     TSI also designed and implemented the extensive global technologies listed in the SOW, which entailed, among other services, extensive software development.

**C.      Uber Requests Services Beyond The Scope Of The SOW And Delays The Launch Date.**

16.     As set forth above, TSI commenced performance pursuant to the Agreements immediately upon the execution thereof, in order to timely render the travel services set forth in the SOW.

17.     Additionally, immediately following the execution of the Agreements, Uber began requesting, and TSI delivered, services that were outside the scope ("OTS") of the SOW.

18.     TSI was not separately compensated for these OTS services, which included, by way of example and without limitation, devising and implementing a "single sign-on" portal and mobile app delivery (as set forth in more detail below) to enable its traveling employees to efficiently and securely access multiple travel software programs and travel agents around the world; and

devising and implementing Uber marketing materials, videos and voice-recordings to answer dedicated travel service phone lines.

19.    Uber also requested, and TSI delivered, a mobile app and desktop portal for airline booking, to integrate Uber's travel program with Concur, Expensify and several other travel products, all within Uber's single sign-on security platform.   The app and portal were reconfigured approximately 15 times due to after-the-fact changes in Uber's specifications.   This OTS work cost TSI over $100,000 to perform and Uber did not separately compensate TSI for it.

20.    Uber also requested, and TSI delivered, 46 Uber-dedicated phone numbers, text numbers and global e-mail addresses, customized with agents who answered the phone as "Uber" travel agents.   Uber did not compensate TSI for this OTS work.

21.    Uber also required a customized itinerary invoice system, because it was not happy with the Concur's Tripit or Sabre's TripCase systems that are standard in the industry.   Uber demanded and TSI built a global itinerary system customized for Uber at a cost of over $15,000.   This was also OTS work for which Uber did not compensate TSI.

22.    In addition, in or about June of 2015, Uber decided to offer a trip to all of its employees to Las Vegas, Nevada.   The project was called "Ginseng." Mr. Howard Jaffe of Uber requested that TSI manage the air travel for approximately 5,000 Uber employees, create an online travel-booking engine, integrated with their registration software, and perform other travel services for

6

Ginseng, including sourcing commercial and charter discounts.   Mr. Jaffe stated to TSI that it was very important for TSI to excel and "burn the midnight oil" developing this software.   TSI performed the requested services, incurring over $100,000 in out-of-pocket costs to enable Ginseng.   This was also OTS work for which Uber did not compensate TSI.   Upon completion of this OTS, Uber never even viewed the work product.

23.   In part due to the foregoing (and other) OTS requests, and in part due to Uber's firing and hiring a succession of travel service procurement managers responsible for working with TSI (as set forth in more detail below), Uber unilaterally pushed back the contractual January 2, 2015 launch date on several occasions.

24.   At Uber's request, TSI initiated a limited "pilot" launch during January of 2015 (the "Pilot Launch").   The Pilot Launch was stopped and started by Uber numerous times, due to Uber's internal decision-making and its requests for additional OTS work which took TSI time to implement.

**D.   Uber Repeatedly Insists That The Contemplated Full, $30MM Launch Is Forthcoming.**

25.   Each time it delayed the full launch, Uber gave TSI assurances not only that the launch was going to occur, but also that it would encompass a minimum of $30 million in annual travel expenses through TSI.   As exemplified by, among other things, an e-mail dated December 31, 2014 from Margaret Brady of Uber to TSI, Uber acknowledged that, through no fault of TSI, it was delaying the full launch.   Like this one, all launch delays were due to Uber's internal issues, such as Uber's lack of foreign credit cards or virtual payment

7

system, or its terminating and/or replacing a succession of travel procurement managers.

26.     On or about February 11, 2015, Howard Jaffe of Uber took over the travel-management duties previously performed by Margaret Brady of Uber. On that date, Mr. Jaffe informed TSI's CEO, Rick Kumpf, that Uber still planned to execute a full launch that would encompass a minimum of $30 million of travel services spending by Uber per year.  Mr. Jaffe requested that TSI delay billing Uber for its monthly service fees and expenses, assuring Mr. Kumpf that TSI would make up any losses with the profits on its business following the Uber launch.

27.     At Uber's request, TSI refrained from billing Uber the contractual minimum monthly fees which were otherwise due pursuant to the Agreements, with the understanding that TSI would be compensated for such services in accordance with the agreed-upon fee structures once the full launch occurred.

28.     TSI continued to perform services both within and outside the scope of the SOW in reliance upon Uber's continued promises and reassurances that it would eventually launch the full program of services pursuant to the Agreements.

29.     Launch dates in January, February, April, May, June and July of 2015 were established and unilaterally canceled by Uber for various reasons unrelated to TSI.

30.     Exemplifying TSI's reliance on Uber's good faith intent to execute the contemplated $30 million full launch, TSI advanced out-of-pocket costs on

behalf of Uber and its traveling management personnel.  These included over $8,000.00 for airline travel between June and September 2015 as part of Uber's China pilot program, which TSI had to pay due to Uber's American Express card being declined, as well as an airline ticket purchased for Uber's Operations and Logistics Manager, Tim Krometis, on June 3, 2015, because the airline he chose did not accept Uber's American Express card.

**E.   Uber    Expresses    Satisfaction    With    TSI's    Travel    Service Implementation.**

31.    At the time Uber engaged TSI's services in November of 2014, Uber's travel services procurement manager was Margaret Brady.  Ms. Brady was complimentary of the job TSI was doing and, by way of example, wrote an e-mail dated February 6, 2015, expressing her satisfaction with TSI at length.

32.    In addition, TSI flew managers and agents to Uber's San Francisco, CA headquarters to manage and oversee the Pilot Launch.  These TSI personnel received numerous compliments – and no complaints – from Uber's personnel while at Uber's headquarters, or at any other time.

33.    In addition, Uber conducted, and shared with TSI, its own surveys of its employees concerning TSI's services.  Every survey response, without exception, ranked TSI's service level as better than satisfactory.

**F.   Uber's Third Travel Services Procurement Manger, Ms. Mayr, Intends To Terminate TSI.**

34.    During TSI's engagement, Uber had a succession of three travel procurement managers.   Ms. Brady, mentioned above, was terminated in February of 2015 and replaced by Ms. Jodi Hughes.

35. Though Ms. Hughes set and re-set new full launch dates several times, she ultimately advised Uber, before being removed herself, that TSI was "ready to launch."

36. In or about late May of 2015, Uber replaced Ms. Hughes with Ms. Karoline Mayr. By all evidence, Ms. Mayr never intended to carry out the contemplated full launch of TSI's travel services for Uber.

37. Ms. Mayr's intent to terminate TSI from the outset of her tenure as Uber's travel services procurement manager was made clear in a June 5, 2015, e-mail she sent to Uber personnel, stating that she would keep them informed regarding the termination of TSI and her engagement of a new travel services company. This e-mail was inadvertently forwarded to TSI approximately one month later.

38. Despite Uber's intent not to go forward with the full contractual launch, Uber continued, even after Ms. Mayr's June 5, 2015 e-mail, to give TSI assurances that the full launch was forthcoming. Uber continued to request, and TSI performed, travel services for Uber at great expense to TSI through June of 2015.

39. On or about July 6, 2015, a scheduled launch date, Ms. Mayr again informed TSI that the full launch was forthcoming, now conditioned upon TSI's successful implementation of the Ginseng project, described above. Subsequent Ms. Mayr's false assurances, Steve Sharlow of Uber, as Director of Procurement, took over the management relationship with TSI from Ms. Mayr.

10

Mr. Sharlow was the fifth and final Uber manager to work on TSI's launch for Uber.

40.     Despite TSI's full performance of all of the tasks Uber requested for the Ginseng project, whether OTS or within the SOW, Uber refused to carry out the contemplated full launch of TSI's services and, ultimately, as set forth further below, terminated TSI without cause.

## G.    **Uber Prematurely Terminates TSI Without Cause, Trigging The Contractual Damage Provisions.**

41.     The contractual term of the Agreements is for 2 years from the Effective Date of November 24, 2014, as set forth in the Services Agreement, ¶ 10 (Ex. 1 hereto) and the Statement of Work (Ex. 2 hereto).

42.     Uber sent TSI a notice of termination dated August 28, 2015 (the "Termination Notice").  The Termination Notice was actually received at TSI's offices via overnight mail on September 8, 2015, having been sent on September 7, 2015.  The Termination Notice contains no complaints or allegations that TSI breached the Agreements in any way, and included a check to TSI in the amount of $201,226.30.

43.     This amount constituted a repayment of the advanced airline travel expense for Mr. Krometis and, upon information and belief, $200,000.00 against service fees (which were outstanding at that time in the amount of approximately $740,000.00, as set forth below).  By letter dated September 11, 2015, TSI informed Uber that further sums were due and owing from Uber to TSI under the Agreements.

44.     In response, Mr. Sharlow requested additional invoices and further breakdowns of TSI's services and costs, both in connection with the Ginseng project and with its technology buildout, which TSI provided.

45.     Mr. Sharlow was subsequently terminated from Uber and Uber has failed to remit the remaining amounts it owes TSI under the Agreements.

46.     The Services Agreement provides, at Paragraph 11.1, that:

> Uber may at its sole discretion terminate all or any part of this Agreement or SOW hereunder by providing Consultant 90 days written notice.   Uber will provide 90 day written notice and Consultant shall be entitled to its costs already incurred in the performance of the Services.   Any termination claim must be submitted within thirty (90) [sic] days after the effective date of termination.

Ex. 1 at 6, ¶11.1.

47.     In accordance with the notice and termination provisions of Paragraphs 12.2 and 11.1, respectively, of the Services Agreement, Uber's termination was effective as of December 7, 2015.   TSI submitted its final termination claim to Uber, pursuant to Paragraph 11.1, on December 8, 2015.

48.     "Services" are defined in the Service Agreement as "the services described in the applicable SOW." Ex. 1 at 1, ¶ 1.4.   TSI's "costs already incurred in the performance of the Services" consist of, at a minimum and subject to further proof at trial:

(a)     $791,580.25   in   implementation   costs   to   achieve   the implementation criteria set forth in the Statement of Work;

(b)     the separate implementation costs of Uber's specially requested Ginseng project in the amount of $101,450;

(c)     the ongoing actual monthly cost of providing travel service to Uber, in the amount of $67,258.50 per month from January 2 through November 26, 2015, or $739,843.50;

(d)     the cost of the airline ticket purchased for Mr. Krometis in the amount of $1,226.30;

(e)     other out-of-pocket costs of travel advanced for Uber's benefit by TSI.

49.     Accordingly, TSI seeks to recover these amounts from Uber, less a credit for Uber's partial payment with its Termination Notice, in addition to other damages as further set forth below.

## H.     Uber Brokers The Hiring Of Former TSI Personnel By Its New Travel Services Provider.

50.     After Uber terminated TSI, it engaged the services of Egencia, which is the business travel division of Expedia, Inc. and BCD Travel.

51.     In or about December of 2015, shortly after Uber began using Egencia's services, Egencia, at Uber's request and direction, hired former TSI employee, Ms. Laura Vasquez, to work on the Uber account for Egencia.  Ms. Vasquez was one of the TSI travel agents on the Uber account.

52.     Ms. Vasquez was, at the time she was hired by Egencia, under continuing obligations set forth in a Confidentiality, Non-Solicitation and Employee Agreement with TSI or one of its affiliates (the "NDA").  The NDA provides, in relevant part:

> Employee further agrees that Employee, for a period of twenty-four (24) months after he/she ceases to be employed by Company, will not solicit or do business

13

directly or through any business enterprise with any of Company's customers or clients which were doing business with Company, nor will Employee do business with any potential customers of Company which had engaged in business discussions with Company or had otherwise contemplated doing business with Company during the period that Employee acted as an Employee of Company.

53.    By accepting employment with Egencia to serve Uber's travel needs within 24 months of leaving TSI, Ms. Vasquez violated her obligation under the NDA not to "do business directly or through any business enterprise with any of Company's customers or clients which were doing business with Company."

54.    Upon information and belief, Uber was aware of the existence of Ms. Vasquez' obligations under the NDA.

55.    Upon information and belief, notwithstanding its knowledge of their contracts, Uber encouraged, arranged and otherwise induced the Former TSI Employees to leave TSI and go to work for Egencia.

56.     Upon information and belief, notwithstanding its knowledge of their contracts, Uber encouraged, arranged and otherwise induced Egencia to hire the Former TSI Employees.

57.    Upon information and belief, Uber engaged in the foregoing inducement to breach of contract knowingly and intentionally, for the purpose of capitalizing on the knowledge and experience the Former TSI Employees obtained about Uber's travel service requirements by working for TSI on Uber's account.

I.   **Uber Makes Defamatory Comments To TSI's Customer and A Prospective Customer.**

58.   TSI was informed by its client, Chicago-based in-flight ISP Gogo, Inc., in or about September of 2015, that Mr. Steve Sharlow, at the time speaking as Uber's employee, agent and representative, made disparaging and defamatory statements concerning TSI's conduct of its business.   These statements included, in substance and without limitation, asking Gogo's administrative personnel why they were using TSI, and claiming that TSI was ineffective and incompetent as a travel service provider.

59.   During the entire time in which TSI was performing services for Uber, Mr. Sharlow never personally booked travel utilizing TSI's services. Accordingly, he made the aforementioned defamatory statements entirely without regard for the truth thereof.

### V.   CAUSES OF ACTION

### COUNT 1
### (Breach of Contract)

60.   Plaintiff re-alleges and incorporates by this reference Paragraphs 1 through 59, above, as if fully set forth herein.

61.   Plaintiff and Defendant entered into valid, legally-binding and enforceable contracts, including the Services Agreement and Statement of Work.

62.   Defendant has breached the terms of those contracts by, *inter alia*:

(a) terminating the Agreements prematurely and without cause, prior to the expiration of the two-year contractual term;

(b) failing to remit to TSI the "costs [TSI] already incurred in the performance of the Services," as required by the Services Agreement, Paragraph 11.1 in the event of a premature termination;

(c) failing to carry out the full launch of TSI's services as contemplated in the Agreements; and

(d) failing to compensate TSI for products and services it delivered within and outside the scope of the Agreements, pursuant to Uber's requests for such products and services.

63.    Plaintiff has fully performed and satisfied, to the extent it has not legally been excused from doing so as a result of Defendant's breaches, all obligations and conditions precedent under its contracts with Defendant.

64.    Defendant's breaches were committed knowingly, intentionally, willfully and with the intent to unlawfully obtain benefits from Plaintiff.

**WHEREFORE**, Plaintiff has been damaged by Defendant's breaches and seeks monetary recovery therefor, in an amount to be determined at trial, but not less than the following:

(a)    $791,580.25 in implementation costs to achieve the implementation criteria set forth in the Statement of Work;

(b)    the separate implementation costs of Uber's specially requested Ginseng project in the amount of $101,450;

(c)    the ongoing actual monthly cost of providing travel service to Uber, in the amount of $67,258.50 per month from January 2 through November 26, 2015, or $739,843.50 (subject to an offset of $200,000.00);

16

(d)     the cost of airline travel advanced the Uber China pilot launch, in the amount of $8,112.82;

(e)     other out-of-pocket costs of travel advanced for Uber's benefit by TSI in an amount to be determined;

(f)     Plaintiff's costs in connection with prosecuting this lawsuit, including its reasonable attorneys' fees, to the extent permitted under the law;

(g)     pre-judgment interest to the extent permitted under the law; and

(h)     exemplary damages based on Defendant's willful, intentional and egregious misconduct to the extent permitted under the law;

### COUNT 2
### (Unjust Enrichment/Quantum Meruit)

65.     Plaintiff re-alleges and incorporates by this reference Paragraphs 1 through 59, above, as if fully set forth herein.

66.     Defendant has been unjustly enriched insofar as it has received benefits from Plaintiff for which Plaintiff reasonably anticipated, but never received, compensation.

67.     Defendant knowingly used and benefited from the products and services provided by Plaintiff.  These products and services were accepted by Defendant, who should have expected to pay Plaintiff for the products and services rendered.  By failing to pay for products and services, and by receiving the benefits thereof, Defendant has been unjustly enriched.

68.     The reasonable value of the aforementioned products and services, and the financial benefit to Defendant therefrom, currently is estimated to be at

17

least $1,450,000.00, which is a reasonable charge after all just and lawful offsets, payments, and credits have been allowed.

**WHEREFORE,** Plaintiff seeks to recover for Defendant's unjust enrichment, in an amount to be proved at trial, but not less than the following:

(a)    $1,450,000.00 for the reasonable value of products and services Plaintiff delivered to Defendant after credit for all prior payments;

(b)    Plaintiff's costs in connection with prosecuting this lawsuit, including its reasonable attorneys' fees, to the extent permitted under the law;

(c)    pre-judgment interest to the extent permitted under the law; and

(d)    exemplary damages based on Defendant's willful, intentional and egregious misconduct to the extent permitted under the law.

### COUNT 3
### (Fraud)

69.    Plaintiff re-alleges and incorporates by this reference Paragraphs 1 through 59, above, as if fully set forth herein.

70.    As set forth hereinabove, during the negotiation and performance of the Agreements, Defendant knowingly, intentionally and with the purpose to deceive Plaintiff, made material misrepresentations and omitted material facts from its statements to Plaintiff about, *inter alia*, Defendant's intent to carry out the full launch of Plaintiff's travel products and services as contemplated by the parties, including the following:

(a)  On or about February 11, 2015, Howard Jaffe of Uber informed Rick Kumpf of TSI that Uber still planned to execute a full launch that would encompass a minimum of $30 million of travel spend by Uber per year.  Mr.

18

Jaffe requested that TSI delay billing Uber for its monthly service fees and expenses, assuring Mr. Kumpf that TSI would make up any losses with the profits on its business following the Uber launch.

(b)   Ms. Mayr and others at Uber continued to give TSI assurances in June and July of 2015 that the full $30 million launch of TSI's services was forthcoming, including but not limited to Ms. Mayr's July 6, 2015 statement that the launch would occur, conditioned upon TSI's successful completion of its work on the Ginseng project.  These assurances occurred notwithstanding Ms. Mayr's inadvertently-disclosed June 5, 2015 e-mail to Uber personnel, stating that she would keep them informed regarding the planned termination of TSI and her engagement of a new travel services company.  The launch never occurred, despite TSI's successful completion of its work, *i.e.*, the implementation of software for a group booking engine for the Ginseng project.

71.   The foregoing misrepresentations and omissions were part of Defendant's overall scheme to induce Plaintiff to enter into and perform pursuant to the Agreements, to undertake work outside the scope of the Agreements and to deliver useful products and services that would not only provide immediate benefits, but also continue to provide benefits after Defendant terminated Plaintiff.

72.   The foregoing misrepresentations and omissions did in fact induce Plaintiff's actual and justifiable reliance thereon in entering into the Agreements and in providing products and service within and outside the scope thereof.

73.     Plaintiff has been damaged by Defendant's fraudulent conduct by, *inter alia*, delivering valuable products and services to Defendant, at great expense to Plaintiff, which products and services it would not have delivered and which expenses it would not have incurred, but for the fraudulent misrepresentations and omissions of Defendant described above.

**WHEREFORE,** Plaintiff seeks to recover for Defendant's fraud, in an amount to be proved at trial, but not less than the following:

(a)     $1,450,000.00 for the actual harm caused to Plaintiff by Defendant's fraudulent conduct;

(b)     Plaintiff's costs in connection with prosecuting this lawsuit, including its reasonable attorneys' fees, to the extent permitted under the law;

(c)     pre-judgment interest to the extent permitted under the law; and

(d)     exemplary damages based on Defendant's willful, intentional and egregious misconduct to the extent permitted under the law.

## COUNT 4
### (Tortious Interference With Contract)

74.     Plaintiff re-alleges and incorporates by this reference Paragraphs 1 through 59, above, as if fully set forth herein.

75.     The former TSI employee, Ms. Vasquez, had, at all relevant times, a valid and subsisting contract which prohibited her from performing travel-related services for Defendant for a period of 24 months following the termination of their employment by Plaintiff.

76.     Defendant at all relevant times had knowledge of the former TSI employee's contract with Plaintiff and, in particular, that the former TSI

employee was prohibited from performing travel-related services for Defendant for a period of 24 months following the termination of her employment by Plaintiff.

77.     Notwithstanding its knowledge of her contract, Defendant arranged, encouraged and otherwise induced the former TSI employee to breach her contract, by accepting employment with Defendant's new travel service provider, Egencia.

78.     Notwithstanding its knowledge of the former TSI employee's contract, Defendant arranged, encouraged and otherwise induced Egencia to cause the former TSI employee to breach her contract, by offering her employment as a travel service provider for Defendant.

79.     The former TSI employee, Ms. Vasquez, in fact breached her contract with Plaintiff as a direct and proximate result of Defendant's conduct.

80.     Defendant's inducement of the former TSI employee's breaches of contract was intentional and willful.

81.     Plaintiff has suffered damages from Defendant's inducement of the former TSI employee's breaches of contract in the form of, *inter alia*, expended, unreimbursed, and lost training, recruiting and advertising costs, as well as lost revenues from the services that would otherwise have been rendered by the former TSI employee.

**WHEREFORE,** Plaintiff seeks to recover for Defendant's intentional and tortious interference with its contracts with the former TSI employee, Ms. Vasquez, in an amount to be proved at trial, but not less than the following:

21

(a)     $250,000 to compensate Plaintiff for its losses resulting from Defendant's interference with contract;

(b)     Plaintiff's costs in connection with prosecuting this lawsuit, including its reasonable attorneys' fees, to the extent permitted under the law;

(c)     pre-judgment interest to the extent permitted under the law; and

(d)     exemplary damages based on Defendant's willful, intentional and egregious misconduct to the extent permitted under the law.

## COUNT 5
### (Defamation/Business Disparagement)

82.     Plaintiff re-alleges and incorporates by this reference Paragraphs 1 through 59, above, as if fully set forth herein.

83.     As set forth hereinabove, Uber verbally disseminated to third-parties, to wit, Gogo, Inc., and thereby published, false and disparaging information about TSI, to wit, its allegedly poor execution and conduct of its travel services business.

84.     As set forth hereinabove, including at Paragraphs 60 through 62, Uber made the aforementioned defamatory statements with malicious intent and, upon information and belief, for the purpose of intimidating TSI and in retaliation for TSI's demand for just compensation. Uber aforementioned defamatory statements were made with knowledge of their falsity and/or with reckless disregard for their truth, were without privilege and caused special damages to the TSI in the form of lost and/or decreased business.  Uber intended by its defamatory statements to interfere with TSI's economic interests.

**WHEREFORE**, Plaintiff seeks to recover for Defendant's defamation and business disparagement in an amount to be proved at trial, but not less than the following:

(a)     $250,000 to compensate Plaintiff for its losses resulting from Defendant's unlawful statements;

(b)     Plaintiff's costs in connection with prosecuting this lawsuit, including its reasonable attorneys' fees, to the extent permitted under the law;

(c)     pre-judgment interest to the extent permitted under the law; and

(d)     exemplary damages based on Defendant's willful, intentional and egregious misconduct to the extent permitted under the law.

## VIII.
## JURY DEMAND

Plaintiff seeks a trial by jury on all causes of action herein so triable.

Respectfully submitted,

SHEBAR LAW FIRM
By: /s/Steven M. Shebar
IL State Bar No. 6297608
(Admitted to Practice in N.D. Tex.)
110 N. Gables Blvd.
Wheaton, Illinois 60187
708.434.5669 (direct)
630-877-6833 (mobile)

BOYD & STAPELTON
By: /s/ Dan Boyd
TX State Bar No. 02765500
5001 Spring Valley Rd
Suite 400E
Dallas, Texas 75244
(972) 383-1260 (telephone)
dan@boydstap.com
***ATTORNEYS FOR PLAINTIFF***

23